**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

PARCILLA G. SALLEY,

   **Plaintiff,**

v.             **Civil Action No. 3:20cv939**

SCHOOL BOARD OF AMELIA COUNTY,
VIRGINIA, *et al.,*

   **Defendants.**

## MEMORANDUM OPINION

This matter comes before the Court on Defendants School Board of Amelia County,

Virginia (the "School Board"), Jack McKinley, and David Smith's (collectively, "Defendants")

Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)[1] (the "Motion to

Dismiss"). (ECF No. 9.)  Plaintiff Parcilla G. Salley responded, (ECF No. 11), and Defendants

replied, (ECF No. 12).  This matter is ripe for disposition.  The Court dispenses with oral

argument because the materials before it adequately present the facts and legal contentions, and

argument would not aid the decisional process.  The Court exercises jurisdiction pursuant to 28

U.S.C. §§ 1331[2] and 1367(a).[3]  For the reasons that follow, the Court will grant Defendants'

Motion to Dismiss.

---

[1] Rule 12(b)(6) allows dismissal for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

[2] "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.  The Complaint alleges that the School Board violated Salley's rights pursuant to the Civil Rights Act of 1866, 42 U.S.C. § 1981(a).  (Am. Compl. 1–2, ECF No. 8.)

[3] The Court exercises supplemental jurisdiction over Salley's claims arising under Virginia law pursuant to 28 U.S.C. § 1367(a) ("[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other

## I.  Factual and Procedural Background

This action arises out of alleged workplace racial discrimination, racial harassment, and retaliation that Defendants McKinley and Smith—two white men and Salley's former supervisors—directed at Salley, an African-American woman, during her tenure as principal of Amelia County High School ("ACHS"), in violation of 42 U.S.C. §§ 1981[4] and 1983.[5]  (Am. Compl. ¶¶ 1, 3–4, 30–53.)  Salley also raises pendent claims of tortious interference with contract and common law conspiracy.  (*Id.* ¶¶ 54–63.)

---

claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . . .").  The Amended Complaint alleges pendent claims of tortious interference with contract and common law conspiracy.  (Am. Compl. 2.)

[4] 42 U.S.C. § 1981 provides:

> All persons within the jurisdiction of the United States have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . .

42 U.S.C. § 1981(a).

[5] 42 U.S.C. § 1983 provides a private right of action for a violation of constitutional rights by persons acting under the color of state law:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

## A.   Factual Background[6]

Salley holds both a Bachelor of Science in Accounting Degree and a Master's in Education Administration and Supervision Degree from Virginia State University. (Am. Compl. ¶¶ 8–9.) Between 2013 and 2019, Salley served as principal of ACHS. (*See id.* ¶ 8.) "Between 2014 and 2018, ACHS was accredited and was the only school in the division with consistently high performance." (*Id.*) ACHS was also a "Blue Star [S]chool for Career and Technical Education" that evinced a "culture of high success." (*Id.*)

Salley alleges that starting in 2015 and continuing through March 2019, McKinley—the Superintendent of Amelia County Public Schools ("ACPS") until July 2018—and Smith—McKinley's replacement as Interim Superintendent of ACPS—engaged in discriminatory, harassing, and retaliatory conduct aimed at Salley that was "motivated by racial animus." (*Id.* ¶¶ 3–4, 8–9.) Salley states that ACHS was an "extremely hostile work environment" that included "racist bullying" confirmed by disparagement of her "character[, . . .] integrity," and "decision making" that "escalated over the years." (*Id.* ¶¶ 8–9.) Salley maintains that the hostile workplace created and perpetuated by McKinley and Smith caused her to resign as principal of ACHS in March 2019. (*Id.* ¶ 8.) The Court recounts the factual background precipitating Salley's resignation.

---

[6] For the purpose of the Rule 12(b)(6) Motion to Dismiss, "a court 'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff.'" *Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 440 (4th Cir. 2011)).

1.     **2015–2018:  McKinley's Allegedly Discriminatory and Harassing Conduct Toward Salley**

Paragraph Nine of Salley's Amended Complaint presents a catalog of eight discriminatory incidents that undergird her action against McKinley (and ultimately the School Board).  Salley alleges that Superintendent McKinley's racial misconduct toward her began in 2015, after Martha Eagle became the Human Resources ("HR") Director for ACPS.  (Am. Compl. ¶ 9.)  The first incident occurred shortly after Martha Eagle started working as the HR Director.  (*Id.*)  Salley states that McKinley stopped by her office unannounced and said, "[y]ou and Dr. Eagle are going to have to get along."  (*Id.*)  This question startled Salley.  (*Id.*)  McKinley then allegedly asked Salley, "[i]s it because she [(Dr. Eagle)] is white?"  (*Id.*)   Salley avers that McKinley ended the interaction by laughing and stating, "I'm just kidding."  (*Id.*)  Salley reported the incident to Allen Vernon, Director of Operations for ACPS, and Steve Hudson, her Assistant Principal at ACHS.  (*Id.*)

The second event occurred about one year later, in 2016, after Salley wrote a letter recommending nonrenewal of a tenured Spanish teacher, Lisa Landa, because of ongoing professional ethics violations.  (*Id.*)  Salley asserts that she, Superintendent McKinley, and HR Director Eagle met in McKinley's office to discuss her letter, and that during the meeting, McKinley leaned forward and yelled at her.  (*Id.*)  Eagle allegedly intervened, saying to Salley, "you may leave if this makes you feel uncomfortable."  (*Id.*)  According to Salley, this was not the only occasion during which McKinley confronted her in the presence of her colleagues.  Indeed, she recounts two more examples of such situations:  the third and fourth incidents.  (*See id.* ¶ 9.)

During the third incident—a principals' meeting on attendance data—McKinley "singled [Salley] out" and asked her to "bring additional information [regarding] the high school

4

attendance." (*Id.*) The next day, Salley gave McKinley the requested information and asked why McKinley only asked for this information from her. (*Id.*) McKinley allegedly responded by noting that he could ask Salley for whatever he wanted, to which Salley replied, "[y]es, you can." (*Id.*) McKinley, Salley submits, retorted, "[i]f you wanted my job, you should have applied for it." (*Id.*) Salley reported this conversation to Director Vernon. (*Id.*)

During the fourth event outlined in Paragraph Nine, at another principals' meeting, McKinley played a video unrelated to any planned school activities or curriculum. (*Id.*) According to Salley, McKinley and another principal laughed hysterically "when the main character, who was a black male, started mispronouncing the names of African-American students." (*Id.*) The video and McKinley's response "made [Salley] feel extremely uncomfortable." (*Id.*)

Salley contends that during the fifth incident, McKinley verbally accosted her in the hallway about an issue with his son's transportation, following Salley into her office while yelling at her down the hall. (*Id.*) After Salley started to cry, McKinley allegedly hugged her and said, "I have to get out of here." (*Id.*)

The sixth event occurred in 2017, while Salley was serving as Interim Finance Director of ACPS.[7] (*Id.*) At a director's meeting, Superintendent McKinley asked Salley to remove a teacher from a special program. (*Id.*) Salley submits that even though she did as instructed, McKinley questioned her actions and became "extremely agitated and loud toward [her] using an accusatory and disrespectful tone that made [her] feel threatened." (*Id.*)

---

[7] In her Amended Complaint, Salley states that she "was the Intern Finance Director." (Am. Compl. ¶ 9.) The Court believes the word "Intern" is an accidental typographical error, and, in any event, it has no effect on the Court's analysis of the instant Motion to Dismiss.

The seventh incident mentioned in Paragraph Nine occurred in November 2017. (*Id.*) It began when McKinley told a local news channel that Salley "stopped a group prayer that students began in the hallway between classes." (*Id.*) Salley maintains that this statement was false, and that even after she submitted a video refuting McKinley's statement, McKinley refused to apologize for or retract what he said. (*Id.*) Salley emailed the School Board, and Board Member Jim Ferrara replied that the School Board would discuss the matter. (*Id.*) The School Board, however, "never followed up." (*Id.*) Salley then met with McKinley, asking him to submit a rebuttal to newspapers. (*Id.*) McKinley refused to issue a statement and asked her if she thought she was "above" being reprimanded. (*Id.*) Salley submits that McKinley never made public statements about white administrators. (*Id.*)

The eighth cataloged event involving McKinley occurred in 2018. (*Id.*) At some point during that year, Salley suspended "a student whose parents seemed to have a problem with minority groups." (*Id.*) According to Salley, McKinley questioned Salley about her actions in the presence of Director Vernon and raised doubts about whether she proceeded properly. (*Id.*) Salley contends that a video demonstrated that she handled the matter appropriately. (*Id.*) Even though McKinley allegedly watched this video, he nevertheless forbade Salley from handling any other cases involving that student in the future. (*Id.*) Salley asserts that McKinley never treated any of her white colleagues as he treated her.[8] (*Id.*)

---

[8] Of the eight incidents Salley identifies in Paragraph Nine, even read favorably, only four implicate race: the first incident, the fourth incident, the seventh incident, and the eighth incident. (*See* Am. Compl. ¶ 9.) The remaining four incidents—the second incident, the third incident, the fifth incident, and the sixth incident—do not implicate race at all. (*See id.*) For instance, in the fifth incident, "McKinley attacked Plaintiff verbally in the main office because of an issue with his son's transportation." (*Id.*) Salley makes no effort to provide context that would suggest that this event was motivated by racial bias. Because the second, third, fifth, and sixth incidents do not implicate race, they cannot support Salley's § 1981 claims.

In addition, despite implicating race, the seventh event also cannot support Salley's § 1981 claims. To show McKinley's racial animus, Salley uses comparator evidence: She states

## 2.   Summer 2018:  McKinley and the School Board Allegedly Retaliate Against Salley

Salley states that in May 2018, Superintendent McKinley and the School Board retaliated against her for fighting back against McKinley's "discrimination and relentless disparate treatment" of her.  (Am. Compl. ¶ 10.)  In her Amended Complaint, she describes facts surrounding her application, and interview, for the position of Director of HR and Instruction for ACPS as an example of this retaliation.

On May 18, 2018, Salley "submitted a letter of interest for the position" of Director of HR and Instruction for ACPS.  (*Id.* ¶ 11.)  Four days later, on May 22, 2018, McKinley sent Salley—and placed in her personnel file—a letter of reprimand pertaining to a month-earlier April 25, 2018 conversation regarding mandatory reporting to child protective services.  (*Id.* ¶ 12; *see id.* ¶ 15.)  This constitutes the ninth claim of discrimination raised by Salley.  The next day, on May 23, 2018, Salley submitted a complaint to the School Board about McKinley's letter of reprimand.  (*Id.* ¶ 13.)  On May 25, 2018, Salley replied to McKinley's letter, stating:

> This letter is a formal rebuttal to the reprimand letter given to me by Dr. Jack McKinley on May 22, 2018.  I want to formally express my point of view on record

---

that "McKinley made no public statements about any [white] administrators."  (*Id.*)  However, when a plaintiff claims a violation of § 1981 based upon a comparison to an employee from a non-protected class, "the validity of [the plaintiff's] prima facie case depends upon whether that comparator is indeed similarly situated."  *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010); *see also Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 191 (4th Cir. 2010) (affirming dismissal of the plaintiff's race discrimination claim because the complaint failed to plausibly allege that white coworkers were "actually similarly situated or that race was the true basis for [the plaintiff's] termination.").  Salley pleads no facts indicating that she was similarly situated to white administrators in ACPS.  Therefore, her allegations pertaining to the seventh incident cannot support her § 1981 claims.

Thus, the Court can consider only the first, fourth, and eighth incidents in analyzing Salley's § 1981 claims against McKinley.  Moreover, even if the Court were to consider all eight claims in Paragraph Nine as part of Salley's § 1981 claims, it would still conclude that Salley has failed to state a claim under § 1981 as to McKinley.

7

and share my concerns about the hostile working environment[9] that I feel Dr. McKinley has created in Amelia County Public Schools for me as my supervisor.

As such, I feel that the letter given to me was unwarranted, untimely, and a passive aggressive attempt to sabotage my professional reputation and undermine my professionalism.

A letter was given to me on May 22, 2018, in response to a conversation that was held with Dr. McKinley on April 25, 2018. However, between April 25, 2018 and May 22, 2018, no verbal or written correspondence or follow-up was given to me by Dr. McKinley.  Nor has this issue come up again during other subsequent meetings with Dr. McKinley.

Furthermore, I feel that the timing of the letter is coincidental to my application for the position of Director of Human Resource and Instruction, which I submitted Friday, May 18, 2018.

Coincidentally, [on] May 22, 2018, Dr. McKinley requested that I meet with him. When I arrived to meet with Dr. McKinley, also there at the meeting was Anu Upadhyaya, Director of Pupil Personnel and Federal Programs.  The Director of Human Resources was not present at this meeting.

During the May 22, 2018, meeting Dr. McKinley stated that he wanted to discuss mandatory reporting to child protective services with me and then he proceeded to read a letter of reprimand to me about a conversation between him and I held on April 25, 2018.  In my response to Dr. McKinley during this meeting, I shared that I was concerned with the timeliness of the letter because the previous conversation about the issue of mandatory reporting had been held one month prior.  I stated to

---

[9] Salley identifies two times where she explicitly described her work environment as hostile in communications with the School Board. (*See* Am. Compl. ¶¶ 14, 22.) One instance (that above) involved McKinley. (*Id.* ¶ 14.) A second instance involved Smith. In that instance, Salley described her working environment as "hostile" in an email to the School Board and stated to the School Board that she felt as though Smith targeted her. (*Id.* ¶ 22.) Although Salley used the terms "hostile working environment" or "hostile work environment" in both communications, her Amended Complaint fails to state the basis of the hostility—racial animus or otherwise.  As such, these events cannot support Salley's § 1981 claims.

Likewise, Salley also contends that the School Board's conduct in reaction to her letter regarding McKinley's retaliatory behavior typified "how the School Board routinely retaliated and responded to racial discrimination," but this allegation also cannot support her § 1981 claims. (*Id.* ¶ 15.) Not only does Salley fail to support this allegation with any factual specificity, she also states that the School Board voted to remove McKinley's letter from her personnel file. (*Id.*) That is, in the end, the School Board sided *with* Salley, not *against* her. Salley's subjective feelings about how individual members cast their votes cannot transform this into a racially tinged event, nor can they outweigh that the School Board ultimately chose to side with Salley over McKinley. (*See id.*)

8

Dr. McKinley that I thought the timing of the letter was coincidental because I applied for the Director of Human Resource and Instruction position on Friday, May 18, 2018.

As the meeting progressed and I realized the meeting was about a personnel issue related to me, and not about mandatory reporting, I asked Dr. McKinley three times, if I could record the conversation and he stated, "No". I also felt Mr. Upadhyaya's presence in the meeting as he was reading a reprimand letter to me was a violation of my privacy since Mr. Upadhyaya had no direct involvement with the issue on April 25, 2018. I indicated to Mr. Anu and Dr. McKinley that I felt "Violated". I was reprimanded and given a letter in the presence of Mr. Upadhyaya who is not my direct supervisor or the division Human Resource Director.

(*Id.* ¶ 14.)

Salley met with School Board Member Catherine Wilkinson to discuss the letter. (*Id.* ¶ 15.) According to Salley, Wilkinson told her to "let it go," and that "people get written up all the time and the letter didn't matter." (*Id.*)

Salley nevertheless asked the School Board to remove the reprimand letter from her personnel file. (*See id.*) The Board voted 3-2 to *remove* the letter. (*Id.*) Despite having successfully gotten the letter removed, Salley maintains that "Wilkinson recused herself[,] and another Board [M]ember Michael Neller . . . voted against the letter being removed." (*Id.*) She also suggests that Neller cast his losing vote to retaliate against Salley for her nonrenewal recommendation of Landa in 2016. (*Id.*)

Salley interviewed for the Director of HR and Instruction position in June 2018 notwithstanding Superintendent McKinley's (removed) letter of reprimand. (Am. Compl. ¶ 16.) Salley submits that, "[a]ccording to a member on the panel, [Salley] and an Assistant Superintendent were the top two [candidates] for the position and were granted second interviews." (*Id.*) A third person, Cynthia Reasoner, was also selected for a second interview. (*Id.*) Reasoner, a white woman, was friends with McKinley and had less relevant experience for the position than did Salley. (*Id.*)

On June 14, 2018, McKinley conducted Salley's second-round interview, which included a writing prompt completed without advanced preparation. (*Id.*) Reasoner, unlike Salley, was told in advance what to expect in the second-round interview, and Reasoner prepared a PowerPoint for her interview. (*Id.*) McKinley ultimately selected Reasoner for the Director of HR and Instruction position. (*Id.*) The differences in the interview process and this decision constitute the tenth act of discriminatory conduct Salley raises against McKinley.

### 3. Other Examples of McKinley's Purportedly Discriminatory Hiring Decisions

Salley frames Superintendent McKinley's hiring of Reasoner as one of many discriminatory personnel decisions in which McKinley favored white applicants over their more qualified minority counterparts. (*Id.* ¶ 17.) Specifically, Salley presents four additional instances in which McKinley evinced discriminatory hiring preferences.

The first occurred in 2017 and involved a Hispanic applicant who interviewed for the Assistant Principal position at ACHS. (*Id.*) Salley alleges that even though this applicant "obtained the highest scores among the candidates" and had exceptional academic qualifications and years of teaching and administrative experience, "McKinley tried to persuade [Salley] that Jennifer Ramey[, a Caucasian applicant,] was a better fit for the position." (*Id.*) Salley does not identify who was actually hired. Because Ramey was later hired for a different position, she likely was not hired for the Assistant Principal position at ACHS. (*See id.*)

In the second hiring event identified by Salley, an applicant named Jan Medley—whose race Salley does not describe—applied for the Principal position at the ACPS middle school.[10]

---

[10] Given that Salley pleads that a Caucasian person was selected for the Principal position instead of Medley, the Court construes the claim favorably to infer that Medley is not white. (*See id.* ¶ 17.)

(*Id.*) The applicant had worked in Amelia County for her entire educational career, and "[s]he had served as a successful assistant principal for several years prior to applying for Principal." (*Id.*) However, despite that applicant's prior experience, a Caucasian individual was selected for the position. (*Id.*)

The third occurred when Valarie Harris, a Black applicant who had taught at middle and elementary schools in Amelia and Chesterfield Counties, applied for the Assistant Principal position at an elementary school in ACPS. (*Id.*) "The job description called for a person who had experience in elementary education." (*Id.*) Despite that description, ACPS hired a white applicant without any experience in elementary schools instead of Harris. (*Id.*)

The fourth suspect hiring event involving McKinley occurred when Valarie Harris applied for the Assistant Principal position at ACHS in June of 2018. (*Id.*) Although Harris received "the highest rating among the other candidates," McKinley allegedly "tried to persuade [Salley] that Harris was not a good candidate for that position." (*Id.*) McKinley "insisted that [Salley] should hire" a white applicant. (*Id.*) However, Harris was ultimately hired to serve as the Assistant principal at ACHS. (*Id.* ¶¶ 21d, 22, 24.)

In sum, Salley submits that McKinley engaged in ten discriminatory acts involving her directly and four discriminatory acts involving the hiring of other individuals,[11] bringing the total number of McKinley's discriminatory acts to fourteen.[12]

---

[11] Although Superintendent McKinley did not direct this alleged discrimination at Salley, "evidence of how others were treated in the same workplace can be relevant to a hostile work environment claim." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 210 (4th Cir. 2019).

[12] As discussed in footnotes 8 and 9, several of these discriminatory acts, even read favorably, cannot support Salley's § 1981 claims. Events two, three, five, and six do not implicate race at all, and therefore cannot support Salley's § 1981 claims for that reason. *See supra* note 8. In addition, with regard to the ninth incident (which prompted Salley's letter to the School Board mentioning her "concerns about [a] hostile working environment"), Salley fails to state a basis for the hostile working environment, and consequently, this allegation cannot

4.    **July 2018–March 2019:  Smith and the School Board's Allegedly
Discriminatory Conduct, Culminating in Salley's Resignation**

On July 10, 2018, the School Board fired Superintendent McKinley.  (*Id.* ¶ 18.)  While

the School Board searched for an Interim Superintendent, Salley served as the Acting

Superintendent.  (*Id.* ¶ 19.)  David Smith was ultimately selected as the Interim Superintendent,

meaning that Salley returned to fulfilling her duties as Principal of ACHS.  (*See id.* ¶¶ 4, 19.)

Salley maintains that "the abuse and discrimination . . . continued unabated" by the

School Board and Smith.  (*Id.* ¶ 21.)  Salley submits that "Smith's hostile behavior toward [her]

originated from a disagreement over the Dual Enrollment Program at the beginning of [2018]."

(*Id.*)  She presents eight incidents involving Smith during his tenure as Interim Superintendent.

The first incident occurred on September 10, 2018.  That day, Director Reasoner called

Salley to meet with her and Interim Superintendent Smith "to discuss a situation concerning the

ACHS nurse."  (*Id.* ¶ 21a.)  Salley alleges that "[a]fter the meeting on September 10, [Salley]

was instructed to write a letter of reprimand for the school nurse, and to intentionally omit

information concerning 50 pills that were missing and the contract hours for the nurse."  (*Id.*)

Salley further asserts that Smith told her to remove the recommendation for termination from the

letter.  (*Id.*)  On September 12, 2018, after Salley submitted a draft copy of the letter to Smith,

Smith sent Salley "a very upsetting email," which allegedly contradicted his previous

instructions and criticized her "ability to write a proper letter."  (*Id.*)  Salley found the email

particularly upsetting because the draft letter reprimanding the nurse "was an exact replica of

---

support her § 1981 claims.  *See supra* note 9.  And as to the seventh incident, Salley fails to
plead any facts showing that she was indeed similarly situated to white administrators in ACPS,
and consequently, that event cannot support her § 1981 claims, either.  *See id.*  Accordingly, the
Court can evaluate only eight of the incidents in Salley's Amended Complaint in its analysis of
her § 1981 claims:  the first incident, the fourth incident, the eighth incident, the tenth incident,
and the four instances Salley describes that illustrate McKinley's discriminatory hiring decisions.

another letter [Salley] wrote on September 11, 2018[,] for an African-American teacher/coach," and "Smith did not have any complaints" about that letter. (*Id.*)

On September 18, 2018, roughly one week later, the second event occurred. That day, Salley asked to keep the air conditioner on at ACHS. (*Id.* ¶ 21b.) According to Salley, Smith, after "rais[ing] his voice at [Salley] in front of her colleagues," denied her request, even though he granted the same request to the white principal of the elementary school. (*Id.*)

The third incident occurred near the end of that month, on September 26, 2018, at a meeting about Special Education staffing. (*Id.* ¶ 21c.) Salley, Smith, Reasoner, and Medley were in attendance. (*Id.*) "Smith informed the group that he wanted to move Sherry Spurlock, [Special Education] Coordinator for . . . Amelia Middle School, to the [h]igh [s]chool and Veronique Bowers-Jackson to the [m]iddle [s]chool." (*Id.*) Salley expressed her concern with that choice, indicating that she did not feel "it was . . . in the best interest of" ACHS and that "this decision would make . . . ACHS the only school in the division without a full-time [Special Education] [C]oordinator." (*Id.*) Salley also notes in her Amended Complaint that Spurlock was concerned about the lack of financial compensation she would receive for her administrative duties.[13] (*Id.*)

The fourth event occurred on September 28, 2018, only two days later. (*Id.* ¶ 21d.) Salley states that Reasoner instructed her "to write a letter of reprimand for the [ACHS] nurse, [Nurse] Eagen, because of an unknown individual who appeared in the clinic." (*Id.*) Later on, Reasoner discussed that situation, as well as "the closing of the clinic during school hours," with Salley. (*Id.*) After the discussion, "Reasoner told [Salley] and Assistant Principal Valerie Harris *not* to write the letter because Mrs. Eagen was on her break when the unknown individual

---

[13] Salley does not proffer any facts in her Amended Complaint contextualizing this incident with racial bias.

13

visited." (*Id.*)  After Salley and Harris discussed some additional concerns, Reasoner agreed with them and postponed a scheduled meeting regarding the incident until October 1, 2018. (*Id.*)

The fifth incident involved Nurse Eagen's son.  Salley states that in 2017, during McKinley's tenure as Superintendent, Nurse Eagen sought to have her son attend ACPS. (*Id.* ¶ 21e.)  However, her request was denied "due to [her son's] criminal history and record with drugs and threatening to kill a principal (African-American)." (*Id.*)  Once Smith became Interim Superintendent, Nurse Eagen made the same request, and without consulting Salley, Smith granted it. (*Id.*)  Salley submits that once Nurse Eagen's son started attending ACHS, he committed multiple "disciplinary infractions including fights, disruption in the building, excessive use of profanity, invasion of privacy, unauthorized entry into the principal's office[,] and assault of school staff." (*Id.*)  Salley contends that "Smith's abrupt decision put [her] staff and administrative team in uncomfortable and unsafe positions." (*Id.*)

On October 5, 2018, following these five incidents, Salley requested via email that the School Board hold a meeting "to discuss Smith's actions." (*Id.* ¶ 22.)  In the email, Salley alleged that:

> Smith had demeaned, repeatedly retracted statements, and given inaccurate information concerning me and operational matters at the high school.  As I stated to Mr. Wilkerson and Dr. Reasoner (Human Resource Director) I am uncomfortable meeting with Dr. Smith alone.  During our meeting yesterday, his aggression was very apparent to all of us in the room.  I am concerned that his hostility and temper might influence the outcome of any meeting that is conducted without the presence of a witness.  This is a hostile environment, and I feel as though he has made me a target.  I feel constantly harassed by him as he uses the most minimal issue to question my role as the high school principal.

(*Id.* ¶ 22.)  Three days later, on October 8, 2018, Salley met with the School Board to discuss her concerns about Smith.  The School Board allowed Smith and Reasoner to remain in the room during the meeting, which "made [Salley] feel very uncomfortable." (*Id.* ¶ 23.)

14

On February 12, 2019—later during the same school year—the sixth event occurred when Smith accused Salley of falsifying an absence. (*Id.* ¶ 24.) According to Salley, Smith knew that she was interviewing for another job in Prince George County, Virginia, and he asked her why she stated that her father was sick on the same day she had her interview. (*Id.*) Salley explained that her father suffers from dementia, and that she visited him the morning of her interview, and that her interview was not until 3:00 p.m. (*Id.*) She then asked Smith how he preferred that she code her absence, to which Smith allegedly replied, "I want you to put down what's right." (*Id.*) Smith informed Salley that he called "Prince George" about an unrelated matter, and that he was asked questions about her. (*Id.*) Salley declares that Smith then questioned her about why she did not include him as a reference for the job in Prince George County. (*Id.*)

On February 14, 2019, Salley advised Reasoner of her intention to file a formal grievance against Interim Superintendent Smith because of a presentation Smith delivered to the School Board about student accomplishments at ACHS—the seventh catalogued incident of Smith's discriminatory conduct. (*Id.*) Salley asserts that "Smith used information from [her] Welcome Back Letters to Parents, Students, and Community Members" to create the presentation. (*Id.*) She proclaims that Smith not only "intentionally omitted the only historically black college or university . . . (Spelman College) that was mentioned in [her] letter," but also "named a few schools ([p]redominantly [w]hite [u]niversities) that were not included in [her] letter." (*Id.*) Salley also asserts that Smith failed to mention ACHS's black history program during the presentation. (*Id.*)

On February 21, 2019, the eighth and final event occurred when Smith wrote Salley an

email about her intention to file the formal grievance against him. (*Id.* ¶¶ 25–26.) In the email,

Smith accused Salley of lying:

> You then sent me the e-mail on Friday [and] ma[de] several false statements. First, you purported to quote from the Student Handbook. However, I could not find the wording you quoted anywhere in the 2018-19 ACHS Student Handbook. Please provide the reference to the source of that quote. Second, you alleged that a parent told you that I made certain statements to her. I talked to that parent and she flatly denied making the statements as you allege. Lastly, your quote "I was taken aback that you had made this request to her . . ." is a false accusation.
>
> Mrs. Salley, if you are going to express concerns or make accusations, it is incumbent on you to be accurate.

(*Id.*) Smith decided to place the email in Salley's personnel file, a decision the School Board

upheld. (*Id.* ¶ 26.) On March 6, 2019, Salley notified the School Board about Smith's email in

an attempt to correct the record and requested that the School Board keep her rebuttal in her file.

(*Id.* ¶ 27.) Specifically, she asserted "that Smith's email was a drastic measure that needlessly

questioned [her] professional judgment and personal integrity as an educator and school leader of

a successful high school in Virginia" and pointed out errors in Smith's accusations. (*Id.*) Salley

submits that "[t]he School Board ignored [her]."[14] (*Id.*)

---

[14] Salley presents a total of six events in her Amended Complaint involving the School Board: (1) the first event, in which Salley informed School Board about McKinley's public accusation that she had stopped a group prayer, but the School Board did not react appropriately, (Am. Compl. ¶ 9); (2) the second event, in which Salley complained to the School Board after McKinley issued her a letter of reprimand and in which she submitted a rebuttal letter stating she was working in a "hostile working environment," (*id.* ¶ 14); (3) the third event, in which Salley met with School Board member Catherine Wilkinson to discuss the letter of reprimand, and then the School Board subsequently voted to remove the letter from Salley's personnel file despite two members voting not to remove it (which Salley declares typified "how the School Board routinely retaliated and responded to racial discrimination"), (*id.* ¶ 15); (4) the fourth event, in which Salley emailed the School Board to request a meeting to discuss Smith's conduct and asserted that she was working in a "hostile environment," (*id.* ¶ 22); (5) the fifth event, in which, as a result of her email, the School Board met with Salley to discuss her concerns, but allowed Smith and Reasoner to "remain[] in the room during the meeting, which made [Salley] feel very uncomfortable," (*id.* ¶ 23); and, finally, (6) the sixth event, in which the School Board upheld

Later in March, the School Board replaced Smith as Interim Superintendent. (*Id.* ¶ 28.)

Two months later, in May 2019, Salley accepted a position in another school district even though

the position offered lower pay. (*Id.* ¶ 29.) Salley alleges that "Smith's actions ruined her career

in Amelia."[15] (*Id.*)

_____

Smith's decision to place his accusatory email in Salley's personnel file, Salley urged the School Board to reconsider the decision, and the School Board ignored her, (*id.* ¶ 27).

None of these events can support Salley's § 1981 claims. To begin, the Court has previously explained why the second, third, and fourth events cannot support Salley's § 1981 claims. *See supra* note 9. Moreover, as to the first event, Salley appears to allege that because McKinley's conduct was motivated by racial animus, the School Board's failure to react appropriately was also motivated by racial animus. However, the Court has previously made clear that because Salley does not support the allegation as to McKinley with any facts indicating that she was similarly situated to white administrators, (*see* Am. Compl. ¶ 9), this allegation cannot support her § 1981 claims as to McKinley, *see supra* note 8. As a result, her allegation that the School Board failed to react properly to McKinley's conduct pertaining to that event also cannot support her § 1981 claims. Further, as for the fifth event, while Salley states that Smith and Reasoner's presence in the meeting made her "feel very uncomfortable," she provides no facts implicating race, and therefore this event cannot support her § 1981 claims. (Am. Compl. ¶ 23.) Lastly, with regard to the sixth event, involving Smith's decision to place his accusatory email in Salley's personnel file, Salley also states no facts implicating race. (*See id.* ¶ 27.) Thus, this incident cannot support her § 1981 claims.

[15] Of the eight incidents Salley identifies involving Smith, even read favorably, only three implicate race: the first incident, the second incident, and the seventh incident. (*See* Am. Compl. ¶¶ 21a, 21b, 24.) The third, fourth, and sixth incidents do not implicate race at all. (*See id.* ¶ 21c, 21d, 24.) For example, in the third incident, "Smith informed [Salley, Reasoner, and Medley] that he wanted to move Sherry Spurlock, [Special Education] Coordinator for . . . Amelia Middle School, to the [h]igh [s]chool and Veronique Bowers-Jackson to the [m]iddle [s]chool." (*Id.*) Salley expressed her concern with that choice, indicating that she did not feel "it was . . . in the best interest of" ACHS and that "this decision would make . . . ACHS the only school in the division without a full-time [special education] coordinator." (*Id.*) She also noted "that no financial compensation was going to be assigned to the administrative part of the position, which was a concern for Mrs. Spurlock." (*Id.*) These allegations make no mention of race, nor does Salley make any effort to contextualize this event with racial bias.

Likewise, Salley does not plead facts sufficient to enable the Court to conclude that Smith's conduct with regard to the fifth incident implicates race. That incident occurred when Smith granted Nurse Eagen's request to have her son attend ACHS despite her son's "criminal history and record with drugs and threatening to kill a principal (African-American)." (*Id.* ¶ 21e.) Salley declares that after Nurse Eagen's son began attending ACHS, he committed multiple "disciplinary infractions including fights, disruption in the building, excessive use of profanity, invasion of privacy, unauthorized entry into the principal's office[,] and assault of school staff." (*Id.*) Salley further asserts that "Smith's abrupt decision put [her] staff and

**B.    Procedural Background**

On November 8, 2020, Salley filed her initial Complaint against Defendants in the

Circuit Court for Amelia County, Virginia. (*See* Resp. 1, ECF No. 11 (noting the Complaint was

filed on November 8, 2020).)  On December 9, 2020, Defendants removed the action to this

Court. (ECF No. 1.)  They then filed Motions to Dismiss. (ECF Nos. 5, 6.)  On March 11, 2021,

Salley filed her Amended Complaint. (ECF No. 8.)  In the Amended Complaint, Salley brings

five counts:

    **Count I:**    The School Board, McKinley, and Smith, while acting under the
                color of law, wrongfully discharged Salley by subjecting her to

---

administrative team in uncomfortable and unsafe positions." (*Id.*)  Although Salley mentions
that Nurse Eagen's son had previously threatened to kill an African American principal, merely
stating this fact is not enough to enable the Court to find that Smith's conduct was based on
Salley's race.  In addition, Salley submits that Smith's conduct "put [her] staff and administrative
team in uncomfortable and unsafe positions." (*Id.*)  That is, she avers that Smith's decision put
her entire staff and administrative team in difficult positions, not just her or other individuals of a
particular race.  This belies any contention that Smith's conduct in the fifth incident was race-
based. Therefore, this allegation, the fifth incident, cannot support Salley's § 1981 claims.

    Even of the three incidents that implicate race, the Court can only consider the seventh
incident in its analysis of Salley's § 1981 claims.  For both the first and second incidents, Salley
uses comparator evidence to illustrate Smith's racial animus.  However, for each incident, she
fails to plead any specific facts showing that the African American and white individuals
involved were indeed similarly situated.  For example, with regard to the first incident, Salley
pleads that Smith had no complaints about a previous, nearly identical, letter of reprimand
written for an African American staff member, but she does not plead any facts showing that the
ACHS nurse and the African American staff member were similarly situated. (*See id.* ¶ 21a.)
Similarly, Salley declares that, during the second incident, Smith denied her request for air
conditioning while granting a similar request for the white principal of the elementary school,
but Salley provides no facts indicating that she and the white principal were similarly situated.
(*See id.* ¶ 21b.)  Because Salley does not plead any facts indicating that the African American
and white individuals involved in the first and second incidents were similarly situated, these two
incidents cannot be used to support her § 1981 claims. *See Haywood v. Locke*, 387 F. App'x
355, 359 (4th Cir. 2010); *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 191 (4th Cir. 2010).

    Thus, of the eight incidents involving Smith that Salley describes in her Amended
Complaint, the Court will consider only the seventh incident in analyzing her § 1981 claims
against Smith.  Even if the Court were to find that all eight incidents could support Salley's
§ 1981 claims, it would nonetheless still conclude that Salley has failed to state a claim under
§ 1981 as to Smith.

pervasive discrimination and harassment, in violation of 42 U.S.C. §§ 1981 and 1983;

**Count II:**    The School Board, McKinley, and Smith, while acting under the color of law, subjected Salley to a hostile work environment, in violation of 42 U.S.C. §§ 1981 and 1983;

**Count III:**    The School Board, McKinley, and Smith, while acting under the color of law, subjected Salley to retaliation for engagement in a protected activity, in violation of 42 U.S.C. §§ 1981 and 1983;

**Count IV:**    McKinley and Smith intentionally interfered with Salley's contract, property rights, and business expectancies by repeatedly discriminating against Salley and publishing false and defamatory statements about her; and,

**Count V:**    McKinley and Smith's concerted actions with others constitute a conspiracy at common law to interfere with Salley's employment.

(Am. Compl. ¶¶ 32, 37, 43–45, 48, 52, 57, 60–61.) Salley seeks: (1) $250,000 in compensatory damages; (2) $350,000 in punitive damages from each Defendant; (3) pre- and post-judgment interest; and, (4) attorney's fees and costs. (*Id.* 24.) On March 25, 2021, Defendants filed the instant Motion to Dismiss. (ECF No. 9.)

For the reasons stated below, the Court will grant the Motion to Dismiss and dismiss every count in the Amended Complaint, without prejudice.

## II.  Standard of Review:  Rule 12(b)(6)

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)). To survive Rule 12(b)(6) scrutiny, a complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for

19

relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."). Mere labels and conclusions declaring that the plaintiff is entitled to relief are not enough. *Twombly*, 550 U.S. at 555. Thus, "naked assertions of wrongdoing necessitate some factual enhancement within the complaint to cross the line between possibility and plausibility of entitlement to relief." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (internal quotation marks omitted).

A complaint achieves facial plausibility when the facts contained therein support a reasonable inference that the defendant is liable for the misconduct alleged. *Twombly*, 550 U.S. at 556; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). This analysis is context-specific and requires "the reviewing court to draw on its judicial experience and common sense." *Francis*, 588 F.3d at 193 (citation omitted). The court must assume all well-pleaded factual allegations to be true and determine whether, viewed in the light most favorable to the plaintiff, they "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679; *see also Kensington*, 684 F.3d at 467 (finding that the court in deciding a Rule 12(b)(6) motion to dismiss "'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff'" (quoting *Kolon Indus.*, 637 F.3d at 440)). This principle applies only to factual allegations, however, and "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

### III. Analysis

The Court will grant the Motion to Dismiss. Because Sally does not plausibly plead working conditions so intolerable as to compel a reasonable person to resign, the Court will dismiss Salley's wrongful discharge claim in Count I. As to Count II, the Court will dismiss

Salley's hostile work environment claim because Salley does not allege conduct severe or pervasive enough to support a claim for a hostile work environment and because she does not plausibly allege that the School Board had a custom or policy of discrimination. Regarding Count III, her retaliation claim, dismissal is also proper because Salley does not plausibly allege that Defendants took an adverse employment action against her, or that her complaints about Superintendent McKinley and Interim Superintendent Smith caused any such action. The Court likewise will dismiss Count IV, the tortious interference with contract claim, because Salley does not adequately allege the existence of a valid contract with which Defendants intentionally interfered. Finally, because the intracorporate immunity doctrine and the statute of limitations bar Salley's common law conspiracy claim, the Court will dismiss Count V.

### A.    Count One:  Constructive Discharge Under § 1981

In Count I, Salley alleges that Defendants wrongfully discharged her by subjecting her to pervasive discrimination and harassment, in violation of 42 U.S.C. §§ 1981 and 1983. Salley does not allege that she was actually fired. Instead, she seems to proceed under a theory of constructive discharge.[16] Salley's constructive discharge claim fails on every front.

### 1.    Legal Standard:  Constructive Discharge Under § 1981

"An employee is . . . constructively discharged 'if an employer deliberately makes the working conditions intolerable in an effort to induce the employee to quit.'" *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 425 (4th Cir. 2004) (quoting *Honor v. Booz–Allen & Hamilton, Inc.,* 383 F.3d 180, 186–87 (4th Cir. 2004)). To state a claim for constructive discharge, a

---

[16] Counsel for Salley does not identify with specificity the nature of the claim in Count I. He styles the claim generically, "Unlawful Employment Practices:  Violations of 42 U.S.C. § 1981." (Am. Compl. 18.) The parties brief this claim as one for wrongful discharge under a theory of constructive discharge, and the Court agrees that is the proper analytical framework to use when assessing Count I. (*See* Mem. Supp. 6–9, ECF No. 10; Resp. 6–8.)

plaintiff must meet a "high standard." *Ofoche v. Apogee Med. Grp., Va., P.C.*, 815 F. App'x 690, 692 (4th Cir. 2020) (citing *Amirmokri v. Balt. Gas & Elec. Co.*, 60 F.3d 1126, 1133 (4th Cir. 1995)). *Cf. Green v. Brennan*, 578 U.S. 547, 555 (2016) ("When the employee resigns in the face of such circumstances, [the law] treats that resignation as tantamount to an actual discharge.").[17] Specifically, a plaintiff must satisfy two elements. *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 211–12 (4th Cir. 2019); *Green*, 578 U.S. at 555.

"First, a plaintiff must show that his [or her] 'working conditions became so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" *Perkins*, 936 F.3d at 212 (quoting *Green*, 578 U.S. at 555). This element "is assessed by the objective standard of whether a reasonable person in the employee's position would have felt *compelled* to resign, . . . that is, whether he [or she] would have had *no choice* but to resign." *Id.* (internal quotation marks and citations omitted). "Critically, difficult or unpleasant working conditions and denial of management positions, without more, are not so intolerable as to compel a reasonable person to resign." *Id.* (listing cases).

As to the second element, "a plaintiff must actually resign because of those conditions." *Id.* Specifically, the plaintiff must allege that but for those conditions, he or she would not have resigned. *See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020).

---

[17] In *Green*, the Supreme Court of the United States addressed constructive discharge in the context of a Title VII claim. *See* 578 U.S. at 555. However, "Title VII and § 1981 claims are governed by the same standard." *Rodriguez v. Elon Univ.*, 751 F. App'x 395, 397 n.* (4th Cir. 2018) (citing *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016)).

### 2. Because Salley Does Not Plausibly Allege Working Conditions So Intolerable as to Compel a Reasonable Person to Resign, She Fails to State a Claim for Constructive Discharge

Even reading Salley's Amended Complaint favorably, the Court finds that she does not articulate the necessary facts to show the objectively intolerable working conditions required by the first element of a constructive discharge claim. Although Salley—who did not resign until Superintendent McKinley and then Interim Superintendent Smith left—discusses several instances of "difficult or unpleasant working conditions," those events, without more, and even considered as a whole, do not support a reasonable inference that her working conditions left her with "*no choice* but to resign." *Perkins*, 936 F.3d at 212.

As an initial matter, Salley remained at ACHS even after Superintendent McKinley and Interim Superintendent Smith had left ACPS. While an employee's resignation after her supervisor's termination does not necessarily defeat a claim of constructive discharge, it does undercut the contention that the employee had no choice but to resign because he or she "quit after the axe had been put away." *Jones v. Nat'l Council of Young Men's Christian Ass'ns of the U.S.*, 48 F. Supp. 3d 1054, 1118 (N.D. Ill. 2014) (quoting *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 680 (7th Cir. 2010)). To be sure, Salley alleges that "Smith's actions ruined her career in Amelia," (Am. Compl ¶ 29), but she fails to plausibly support that conclusory contention. Her assertions that she had to leave ACPS and take a pay cut are belied by the fact that the School Board elevated her to "serve[] in the capacity of Acting Superintendent" a mere ten months before she tendered her resignation in May 2019. (*Id.* ¶ 19.) The School Board trusted Salley to run the Amelia County Public Schools system, even if only in an acting capacity, after McKinley was fired. (*Id.*) This suggests that her career was far from "ruined" in Amelia County. (*Id.* ¶ 29). At the very least, her coincident claims that during her stewardship, ACHS evinced a "culture of high success" countermand that allegation to some degree. (*Id.* ¶ 8.)

In any event, the test for intolerability is not whether Salley subjectively felt compelled to resign, but whether a reasonable person in her position objectively would have. *Perkins*, 936 F.3d at 212. Salley does not meet this standard even at this procedural juncture.

First, Salley alleges that McKinley yelled at her and that McKinley and Smith confronted her in the presence of her colleagues. (*See* Am. Compl. ¶¶ 9, 27.) But the Fourth Circuit has noted multiple times that being yelled at and chastised in front of others, without more, would not compel a reasonable person to resign. *See Perkins*, 936 F.3d at 212 (citing *Williams v. Giant Food, Inc.*, 370 F.3d 423, 434 (4th Cir. 2004) for the proposition that "being yelled at . . . and chastised in front of customers is not so intolerable as to compel a reasonable person to resign").

Second, Salley states that McKinley and the School Board denied her the promotion to the Director of HR and Instruction position even though she had a "superior resume" and was "one of the top two" applicants. (*See* Am. Compl. ¶ 16.) But the Fourth Circuit has spoken to that circumstance, too. In *Perkins*, the court also stated that being denied a promotion would not compel a reasonable person to resign. *See Perkins*, 936 F.3d at 212 (citing *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 273 (4th Cir. 2001) for the proposition that "denial of a management position . . . would not have compelled a reasonable person to resign").

Third, Salley contends that McKinley defamed her, (*see* Am. Compl. ¶ 9), but being subjected to perceived unfounded criticism would not compel a reasonable person to resign, *see Perkins*, 936 F.3d at 212 (citing *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994) for the proposition that "perceived unfair criticism . . . [is] not so intolerable as to compel a reasonable person to resign").

Thus, even if the Court considers all Salley's allegations together as a whole, she fails to satisfy the first element of a constructive discharge claim because she does not allege objectively

intolerable working conditions.  Moreover, even if she stated a claim of intolerability, Salley

falters at the second element:  establishing that she resigned because of those allegedly

intolerable conditions.

> **3.      Because Salley Does Not State Facts Showing That But For
> Defendants' Conduct, She Would Not Have Resigned, She Does Not
> State a Claim for the Second Element of a Constructive Discharge
> Claim:  Causation**

Salley does not allege facts that, even construed in her favor, support the inference that

but for Defendants' actions, she would not have resigned from her position at ACHS.  That is,

Salley's Amended Complaint states no facts supporting the inference that if Defendants' conduct

had not occurred, she would have remained at ACHS and not sought a new position elsewhere.

Thus, even if she had satisfied the first element of a constructive discharge claim, her claim

would still founder.

Importantly, Salley remained at ACHS even after McKinley and Smith had left.  Salley

alleges that McKinley was fired in July 2018—nearly a year before Salley left ACHS—and that

Smith was replaced in March 2019—two months before Salley left. (*See* Am. Compl. ¶¶ 18–19,

28–29.) Again, although Salley alleges that "Smith's actions ruined her career in Amelia," the

Amended Complaint is bereft of facts supporting that inference. (*Id.* ¶ 29.)

Clearly, Salley does not suggest that her working conditions at ACHS from March 2019

to May 2019, when neither McKinley nor Smith worked with her, were intolerable.  Salley's

claim for constructive discharge rests on McKinley's and Smith's "discriminatory animus

towards her race." (*Id.* ¶ 36.) The Amended Complaint omits any mention of animus—even by

the School Board—that continued to infect her work environment after they left. This belies her

claim for constructive discharge. *See Freeman*, 750 F.3d at 425 (affirming a grant of summary

judgment for the defendants on the plaintiff's constructive discharge claim when the plaintiff

resigned after she "had had no contact with [her alleged harasser] for months," and the plaintiff "presented no evidence that [the alleged] harassment was still creating an objectively hostile work environment at the time she resigned").

In short, Salley has not stated a claim that her working conditions were so intolerable as to compel a reasonable person to resign, so her claim for constructive discharge fails. Even if she satisfied the first element, however, Salley's theory of constructive discharge would still fail because she has not stated facts pleading but-for causation. Because her wrongful discharge claim in Count I depends on her theory of constructive discharge, the Court will grant the Motion to Dismiss as to Count I and dismiss Count I without prejudice.

### B.   Because Salley Does Not State Hostile Work Environment Claims Against McKinley, Smith, or the School Board, the Court Will Dismiss Count II

The Court will grant the Motion to Dismiss Salley's hostile work environment claim in Count II against McKinley, Smith, and the School Board. Although Salley plausibly alleges unwelcome conduct imputable to her employer, ACPS, and although she states allegations indicating that at least some of this conduct implicated race, she does not assert facts in her Amended Complaint sufficient for the Court, even reading her allegations favorably, to conclude that Superintendent McKinley or Interim Superintendent Smith's conduct was "sufficiently severe or pervasive to alter [her] conditions of employment and . . . create an abusive work environment." *Dawson v. Wash. Gas Light Co.*, No. 19-2127, 2021 WL 2935326, at *8 (4th Cir. July 13, 2021) (quoting *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (en banc)). Indeed, this conclusion aligns with Salley's own stated facts in her Amended Complaint: She achieved great success at ACHS, and she only chose to leave her position after McKinley and Smith had left. (*See* Am. Compl. ¶¶ 8, 18–19, 27–29.) Moreover, Salley's claim

26

against the School Board also falters because she does not plausibly assert that the School Board had a custom or policy of racial discrimination.

### 1.    Legal Standard:  Hostile Work Environment Claim Under § 1981

A hostile work environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks and citations omitted).  In *Boyer-Liberto*, the Fourth Circuit listed the four elements a plaintiff must show to prevail in a § 1981 hostile work environment claim: "(1) unwelcome conduct; (2) that is based on the plaintiff's [protected status]; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer."  786 F.3d at 277 (quoting *Okali v. City of Balt.*, 648 F.3d 216, 220 (4th Cir. 2011)); *see also id.* (stating that the same test applies for Title VII and § 1981 hostile work environment claims).  For the purposes of this Motion, the parties do not dispute that McKinley and Smith engaged in unwelcome conduct imputable to ACPS, Salley's employer, so only the second and third elements remain at issue.

The second element of a hostile environment claim requires that the offending conduct be based on the employee's "race, color, religion, sex, or national origin." *Strothers v. City of Laurel*, 895 F.3d 317, 329 (4th Cir. 2018) (citing 42 U.S.C. § 2000e-2, and *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331 (4th Cir. 2003) (en banc)). "In other words, [§ 1981] 'does not prohibit all verbal or physical harassment in the workplace'—it is directed only at actions that occur 'because of' one of the protected statuses." *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).  A plaintiff can establish the second element in two ways:

27

"(1) through the 'direct' method, with evidence of intentional discrimination such as discriminatory statements; or[,] (2) through the 'prima facie' method of pleading membership in a protected class and also pleading different treatment from similarly situated employees outside the protected class." *Blaise v. Harris*, No. 3:16cv23, 2016 WL 4265748, at *3 (E.D. Va. Aug. 11, 2016) (citing *Hinton v. Va. Union Univ.*, No. 3:15cv569, 2016 WL 2621967, at *5–6 (E.D. Va. May 5, 2016)). "In determining whether offensive conduct can be attributed to discrimination against the employee's race or other protected status, courts must view the behavior in light of the social context surrounding the actions." *Strothers*, 895 F.3d at 329.

To establish the third element, a plaintiff "must show that a reasonable jury could find that the . . . race-based harassment was so severe or pervasive as to alter the conditions of [his or her] employment and create an abusive or hostile atmosphere." *Perkins*, 936 F.3d at 208 (first alteration in original) (internal quotation marks and citation omitted). This element "has both a subjective and objective component." *Id.* (citation omitted). That is, a plaintiff must allege sufficient facts to show that he or she "did perceive, and a reasonable person would perceive, the environment to be abusive or hostile." *Id.* (citation omitted). In determining whether harassing conduct qualifies as severe or pervasive, the Fourth Circuit has instructed that courts "must look at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008)).

The plaintiff "must clear a high bar in order to satisfy the . . . severe or pervasive test." *Id.* (quoting *Sunbelt Rentals, Inc.*, 521 F.3d at 315). To demonstrate that a defendant's behavior was "objectively severe and pervasive at the motion to dismiss stage, [the plaintiff] must allege

sufficient facts plausibly demonstrating that the workplace was 'permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the [plaintiff's] employment and create an abusive working environment.'" *Jones v. Sun Pharm. Indus., Inc.*, No. 3:19cv566, 2020 WL 2501439, at *6 (E.D. Va. May 14, 2020) (quoting *Mustafa v. Iancu*, 313 F. Supp. 3d 684, 695 (E.D. Va. 2018)); *see also Spruill v. Kip Killmon's Tysons Ford, Inc.*, No. 1:12cv806, 2012 WL 4829339, at *3 (E.D. Va. Oct. 10, 2012) (quoting *Peary v. Gross,* 365 F.Supp.2d 713, 728 (E.D. Va. 2005)) ("Generally, 'incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'"). Indeed, "[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Perkins*, 936 F.3d at 208 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). Even "[i]ncidents that would objectively give rise to bruised or wounded feelings will not . . . satisfy the severe or pervasive standard." *Id.* (quoting *Sunbelt Rentals, Inc.*, 521 F.3d at 315). For example, "[r]ude treatment by [coworkers], callous behavior by [one's] superiors, or a routine difference of opinion and personality conflict with [one's] supervisor, are not actionable under" § 1981. *Id.* (second, third, and fourth alterations in original) (quoting *Sunbelt Rentals, Inc.*, 521 F.3d at 315–16).

### 2. Salley Does Not State a § 1981 Hostile Work Environment Claim Against McKinley, and Therefore Her Claim Against Him Fails

Salley states facts purporting to show that Superintendent McKinley engaged in fourteen incidents of race-based harassment or discrimination over a three-year period. However, as previously discussed, *see supra* notes 8, 9, 12, the Court can consider only eight incidents in its analysis of Salley's § 1981 hostile work environment claim against McKinley: the first incident, in which McKinley joked that Salley had to get along with Eagle because Eagle is white, (Am.

Compl. ¶ 9); the fourth event, in which McKinley and a coworker made fun of Black characters in a video that McKinley played at a principal's meeting, (*id.*); the seventh incident, in which McKinley falsely publicly stated that Salley had stopped a group prayer and then refused to retract his statement, (*id.*); the eighth event, in which McKinley questioned whether Salley appropriately suspended a student whose parents allegedly harbored racial resentment, (*id.*); the tenth event, in which McKinley selected Reasoner for the Director of HR and Instruction position even though Salley had more relevant experience, (*id.* ¶ 16); and, read especially favorably, four incidents in 2017 in which McKinley expressed a hiring preference for white applicants over their more qualified minority counterparts, (*id.* ¶ 17).

Taking her allegations as true, the Court will presume Salley satisfies the first, second, and fourth elements of a hostile work environment claim (as listed in *Boyer-Liberto*[18]) against McKinley. However, at this procedural juncture, even presuming the facts in her Amended Complaint satisfy those three elements, the third element cannot be met. Thus, Salley fails to state a plausible hostile work environment claim as to McKinley, and her claim against him must fail.

        a.    **The Court Presumes that Salley Satisfies the First Element of a § 1981 Hostile Work Environment Claim as to McKinley**

For purposes of the Motion to Dismiss, the Court presumes that Salley satisfies the first element of a § 1981 hostile work environment claim against McKinley, as the parties do not dispute that McKinley engaged in unwelcome conduct. *See Boyer-Liberto*, 786 F.3d at 277

---

[18] In *Boyer-Liberto*, the Fourth Circuit stated the four elements a plaintiff must show to prevail in a § 1981 hostile work environment claim: "(1) unwelcome conduct; (2) that is based on the plaintiff's [protected status]; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." 786 F.3d at 277 (quoting *Okali*, 648 F.3d at 220).

(quoting *Okali*, 648 F.3d at 220) (stating that the first element of a § 1981 hostile work environment claim is that there is unwelcome conduct).

> **b.    The Court Presumes That Salley Satisfies the Second Element of a § 1981 Hostile Work Environment Claim as to McKinley**

The Court presumes that Salley satisfies the second element—that the offending conduct be based on the employee's "race, color, religion, sex, or national origin," *Strothers*, 895 F.3d at 326–27—as eight of the incidents Salley outlines involving McKinley are clearly race-based, supporting a reasonable inference that McKinley's "conduct was motivated by racial animus." *Brown v. Bratton*, No. 19-1450, 2020 WL 886142, at *16 (D. Md. Feb. 21, 2020).

> **c.    Salley Does Not Satisfy the Third Element of a § 1981 Hostile Work Environment Claim as to McKinley Because She Does Not State a Claim That, Objectively, the Offending Conduct Was Severe or Pervasive**

Salley cannot meet the third element of a § 1981 hostile work environment claim. Even reading Salley's Amended Complaint favorably, consideration of "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," *Perkins*, 936 F.3d at 203 (quoting *Sunbelt Rentals, Inc.*, 521 F.3d at 315), indicates that McKinley's "race-based harassment was [not] sufficiently severe or pervasive under" § 1981 to support Salley's hostile work environment claim, *id.* at 208.

First, Superintendent McKinley's alleged conduct was infrequent. Salley plausibly alleges that McKinley engaged in eight incidents of race-based harassment over a three-year period, but eight incidents over a three-year period, especially of the type alleged, is insufficiently frequent to pass muster. *See, e.g., Sonnier v. Diamond Healthcare Corp.*, 114 F. Supp. 3d 349, 357 (E.D. Va. 2015) (stating that the plaintiff in that case alleged three incidents occurring within a two-month period, describing the incidents as "relatively infrequent[],"

indicating that such infrequency did not support a finding that the plaintiff had satisfied the third element, and citing *Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 768–69, 773 (4th Cir. 1997)). Indeed, courts require that "incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Spruill*, 2012 WL 4829339, at *3 (quoting *Peary*, 365 F. Supp. 2d at 728); *see also Rivera v. Prince William Cnty. Sch. Bd.*, No. 1:09cv341, 2009 WL 2232746, at *5 (E.D. Va. July 22, 2009) (citing *Hartsell*, 123 F.3d at 768–69) ("Isolated or infrequent instances of harassment that occur over a period of many months is not sufficiently severe or pervasive."); *Roberts v. Fairfax Cnty. Pub. Schs.*, 858 F. Supp. 2d 605, 610 (E.D. Va. 2012) ("In the context of racial slurs, 'there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments.'" (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110–11 (2d Cir. 1997))). Salley states in a conclusory fashion that McKinley's conduct occurred frequently, (*see, e.g.*, Am. Compl. ¶ 10), but she does not support this contention. She alleges facts describing only eight, largely minor, events over a three-year period. These eight events do not constitute pervasive conduct sufficient to support a hostile work environment claim, and thus her hostile work environment claim as to McKinley must fail.

Second, Salley does not plead facts indicating that McKinley's conduct was *severe* enough to support her hostile work environment claim. The incidents Salley describes in her Amended Complaint involve race-based comments, potentially racially discriminatory hiring practices, and questioning of Salley's decisions potentially because of her race. (*See* Am. Compl. ¶¶ 9, 16–17.) However, these incidents, considered individually, or as a whole, are insufficiently severe to support a finding that Salley has satisfied the third element.[19] *See e.g.*,

---

[19] The Court acknowledges that "[i]n measuring the severity of harassing conduct, the status of the harasser may be a significant factor" because "a supervisor's power and authority

*Taylor v. Millennium Corp.*, No. 1:15cv1046, 2016 WL 927185, at *7 (E.D. Va. Mar. 4, 2016) (noting that the plaintiff "and other African-America[n] employees were passed over for promotions that were given to Caucasian employees, Caucasian employees were given bonuses while African-American employees were not, . . . Caucasian employees were generally paid more[,] . . . [and the company's] COO made several discriminatory statements about African-Americans" and finding these allegations insufficient to support the plaintiff's hostile work environment claim). In addition, while offensive, the conduct here does not rise to the level at which courts have found conduct sufficiently *pervasive. Skipper v. Giant Food Inc.,* 68 F. App'x 393, 398–99 (4th Cir. 2003) (finding that the plaintiff's allegations that a manager harassed him by following him around and referring to him by a racial slur on one occasion, that the plaintiff saw racist graffiti on a daily basis, and that the plaintiff overheard other employees use the same slur thirteen times in a four year period were insufficient to support a hostile work environment claim). *Cf. White v. BFI Waste Servs., LLC*, 375 F.3d 288, 297 (4th Cir. 2004) (stating that the plaintiff alleged that "throughout his employment . . . , supervisors repeatedly called him and other [B]lack employees" many especially offensive epithets, the most mild of which included "boy, . . . porch monkey, . . . and Zulu Warrior," and finding that this conduct satisfied the third element of a hostile work environment claim).

---

invests his or her harassing conduct with a particular threatening character." *Boyer-Liberto*, 786 F.3d at 278 (citing *Rodgers v. W.–S. Life Ins. Co.,* 12 F.3d 668, 675 (7th Cir. 1993), and *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 763 (1998)). However, after considering all of the circumstances Salley describes in her Amended Complaint, the Court finds that McKinley's role as Salley's supervisor did not infuse "his . . . conduct with a . . . threatening character" such that the Court can classify his conduct as sufficiently severe to satisfy the third element. *Id.* (citing *Burlington Indus., Inc.*, 524 U.S. at 763).

The Court also notes that considering the facts as a whole, McKinley's conduct may actually be even less severe than Salley alleges. For instance, Salley herself acknowledges that although Harris was not hired for an assistant principal position at an ACPS elementary school, she *was* hired to be the assistant principal of ACHS. (*See* Am. Compl. ¶ 17.)

Third, although Salley claims that she suffered humiliation because of McKinley's actions, (Am. Compl. ¶¶ 38, 41, 45, 53, 58), her allegations regarding McKinley's race-based conduct "cannot reasonably be described as . . . physically threatening or humiliating" such that they would support a hostile work environment claim.[20] *Perkins*, 936 F.3d at 209. Notably, even presuming racial animus may have motivated McKinley's behavior, the Fourth Circuit suggests that this does not mean McKinley's conduct was physically threatening or humiliating. *See id.* at 203–04, 209 (describing the plaintiff's allegations that he was "mistreat[ed] in various ways compared to white employees," that his employer improperly denied him promotions, and that his colleagues had engaged in racially offensive behavior; noting that it was "no doubt serious

---

[20] Salley alleges one event that made her "feel threatened" and "extremely embarrass[ed]:" the sixth event, in which McKinley yelled at her for removing an employee's access to the Results Driven Accountability framework. (Am. Compl. ¶ 9.) Specifically, she submits that:

> McKinley came into [her] office and said that [the employee] was very upset because her name had been removed from [Results Driven Accountability framework]. McKinley started yelling at [Salley], questioning her actions. He got extremely agitated and loud toward [Salley] using an accusatory and disrespectful tone that made [her] feel threatened. Once McKinley calmed himself down, he apologized. Eagle[, (who was present for the event),] reminded McKinley that he had given [Salley] a directive to remove [the employee's] rights from the . . . system. [Salley] felt extremely embarrassment [sic] and remained speechless.

(*Id.*) However, this event does not implicate race, so the Court will not analyze whether it was physically threatening or humiliating sufficient to support Salley's hostile work environment claim. *See Boyer-Liberto*, 786 F.3d at 277 (stating that the second element of a hostile work environment claim is that the unwelcome conduct "is based on the plaintiff's . . . race" (alteration in original)); *supra* note 8.

Salley also alleges in her Amended Complaint that McKinley made her feel uncomfortable at times. For instance, she states that, during the fourth incident, "[t]he video and McKinley's racist behavior made [her] feel extremely uncomfortable." (Am. Compl. ¶ 9.) She also submits that she "was extremely uncomfortable meeting with McKinley." (*Id.* ¶ 10.) No matter how offensive the video was, she does not allege that McKinley's conduct during the fourth incident was physically threatening or humiliating, or that she felt uncomfortable meeting with him because she felt physically threatened or humiliated, and as a result, these allegations cannot support her § 1981 hostile work environment claim. *See Perkins,* 936 F.3d at 203 (quoting *Sunbelt Rentals, Inc.*, 521 F.3d at 315).

34

to" the plaintiff; but concluding that the incidents were not physically threatening or humiliating).  Although Salley felt humiliated, her subjective perception does not control the legal analysis of her hostile work environment claim.

Fourth, Salley does not allege that McKinley "unreasonably interfere[d] with [her] work performance."  *Id.* at 203 (quoting *Sunbelt Rentals, Inc.*, 521 F.3d at 315).  Indeed, she pleads no facts to support that notion.

Thus, consideration of all the circumstances surrounding McKinley's conduct reveals that it does not satisfy the "severe or pervasive" element of a § 1981 hostile work environment claim.[21]

### d.    The Court Presumes That Salley Satisfies the Fourth Element of a § 1981 Hostile Work Environment Claim as to McKinley

For purposes of Defendants' Motion to Dismiss, the Court presumes that Salley satisfies the fourth element of a § 1981 hostile work environment claim as to McKinley because the parties do not dispute that McKinley's conduct was imputable to ACPS.  *See Boyer-Liberto*, 786 F.3d at 277 (quoting *Okali*, 648 F.3d at 220) (stating that the fourth element of a § 1981 hostile work environment claim is that the defendant's conduct is imputable to his or her employer).

Thus, Salley satisfies, the first, second, and fourth elements of a § 1981 hostile work environment claim as to McKinley.  However, she does not satisfy the third element, and consequently her hostile work environment claim against McKinley must fail.  Accordingly, the Court will dismiss, without prejudice, Count II as to McKinley.

---

[21] Because Salley fails to plead facts in her Amended Complaint enabling the Court to find that McKinley's conduct was objectively severe or pervasive enough to satisfy the third element of a hostile work environment claim, the Court need not, and will not, address whether Salley subjectively believed that McKinley's conduct was severe or pervasive sufficient to satisfy the third element of her hostile work environment claim against him.

### 3. Salley Does Not State a § 1981 Hostile Work Environment Claim Against Smith, and Therefore Her Claim Against Him Fails

In her Amended Complaint, Salley states facts purporting to show that Interim Superintendent Smith engaged in eight incidents of race-based harassment or discrimination over a two-year period. However, as the Court has previously discussed, *see supra* note 15, it can consider only the seventh incident—in which Smith omitted the accomplishments of Black students at ACHS in a presentation to the School Board, (Am. Compl. ¶ 24)—in its analysis of Salley's § 1981 hostile work environment claim against Smith. With this in mind, taking her allegations as true, Salley satisfies the first, second, and fourth elements of a hostile work environment claim (as stated in *Boyer-Liberto*) against Smith. However, the facts alleged in her Amended Complaint do not satisfy the third element. As such, she fails to state a plausible hostile work environment claim against Smith, and her claim against him must fail.

#### a. The Court Presumes That Salley Satisfies the First Element of a § 1981 Hostile Work Environment Claim as to Smith

For purposes of the instant Motion to Dismiss, the Court presumes that Salley satisfies the first element of a § 1981 hostile work environment claim against Smith, as the parties do not dispute that Smith engaged in unwelcome conduct. *See Boyer-Liberto*, 786 F.3d at 277 (quoting *Okali*, 648 F.3d at 220) (stating that the first element of a § 1981 hostile work environment claim is that there is unwelcome conduct).

#### b. The Court Presumes That Salley Satisfies the Second Element of a § 1981 Hostile Work Environment Claim as to Smith

Again, as to the second element—that the offending conduct be based on the employee's "race, color, religion, sex, or national origin," *Strothers*, 895 F.3d at 326–27—the Court will presume that Salley alleges facts to enable the Court, at this procedural juncture, to conclude that the seventh incident pertaining to Smith was clearly

36

race-based, (*see* Am. Compl. ¶ 24), and that this single allegation would satisfy the second element.

<b>c.      Salley Does Not Satisfy the Third Element of a § 1981 Hostile Work Environment Claim as to Smith Because She Does Not State a Claim That, Objectively, the Offending Conduct Was Severe or Pervasive</b>

Salley does not allege facts that enable the Court, reading her Amended Complaint favorably, to conclude that she satisfies the third element of a § 1981 hostile work environment claim as to Smith.  In her Amended Complaint, Salley successfully alleges facts illustrating offensive, race-based conduct for only the seventh incident, in which Smith omitted the accomplishments of Black students at ACHS in a presentation to the School Board.  (*See* Am. Compl. ¶ 24.)  Similar to Salley's allegations pertaining to McKinley, consideration of "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," *Perkins*, 936 F.3d at 203 (quoting *Sunbelt Rentals, Inc.*, 521 F.3d at 315), indicates that  Smith's conduct "was [not] sufficiently severe or pervasive under" § 1981 to support Salley's hostile work environment claim against him, *id.* at 208.

First, Interim Superintendent Smith's race-based conduct was even less frequent than McKinley's.  Even reading her Amended Complaint favorably, Salley alleges only one instance of Smith engaging in race-based conduct over a two-year period.  This single event is insufficient. *See Spruill*, 2012 WL 4829339, at *3 (quoting *Leonard*, 2004 WL 3688406, at *9); *Rivera*, 2009 WL 2232746, at *5 (citing *Hartsell*, 123 F.3d at 768–69); *Sonnier*, 114 F. Supp. 3d at 356–57.

37

Second, the seventh incident did not constitute "severe" conduct that, by itself, could support a hostile work environment claim. Indeed, it was less severe than conduct that the Fourth Circuit and other courts in this District have determined does not satisfy the third element.[22] *See e.g.*, *Taylor*, 2016 WL 927185, at *7; *Skipper*, 68 F. App'x at 398; *supra* Part III.B.2.c.

Third, while Salley claims in her Amended Complaint that she suffered humiliation because of Smith's actions, (Am. Compl. ¶¶ 38, 41, 45, 53, 58), in her Amended Complaint, she pleads no specific facts indicating that Smith's conduct was "physically threatening or humiliating,"[23] *Perkins*, 936 F.3d at 208. While Salley may have subjectively felt humiliated, this is insufficient to support a hostile work environment claim. Thus, her allegations weigh against a finding that she satisfies the third element as to Smith.

Fourth, as with her allegations pertaining to McKinley, Salley does not allege that Smith "unreasonably interfered with her work performance." *Perkins*, 936 F.3d at 203 (quoting *Sunbelt Rentals, Inc.*, 521 F.3d at 315). As before, she pleads no facts supporting that notion.

---

[22] As with Superintendent McKinley, the Court finds that, after considering all of Salley's allegations as to Interim Superintendent Smith, it cannot conclude that Smith's role as Salley's supervisor transformed his conduct into conduct sufficiently severe to satisfy the third element of Salley's hostile work environment claim against Smith. *See supra* note 19; *Boyer-Liberto*, 786 F.3d at 278 (citing *Rodgers*, 12 F.3d at 675, and *Burlington Indus., Inc.*, 524 U.S. 742 at 763).

[23] In her Amended Complaint, Salley alleges that Smith placed her "staff and administrative team," and presumably her as well, "in uncomfortable and unsafe positions," that she felt "uncomfortable meeting with . . . Smith alone," and that when she discussed her concerns about Smith with the School Board while Smith remained in the room, she felt "very uncomfortable." (Am. Compl. ¶¶ 21e, 22–23.)  However, she does not allege that Smith's conduct was physically threatening or humiliating, and these allegations cannot support her § 1981 hostile work environment claim. *See Perkins*, 936 F.3d at 203 (quoting *Sunbelt Rentals, Inc.*, 521 F.3d at 315).

Therefore, as with McKinley, consideration of all the circumstances surrounding Smith's conduct reveals that it does not satisfy the "severe or pervasive" element of a § 1981 hostile work environment claim.[24]

**d.      The Court Presumes That Salley Satisfies the Fourth Element of a § 1981 Hostile Work Environment Claim as to Smith**

For purposes of the Motion to Dismiss, the Court presumes that Salley satisfies the fourth element of a § 1981 hostile work environment claim against Smith because the parties do not dispute that Smith's conduct was imputable to ACPS. *See Boyer-Liberto*, 786 F.3d at 277 (quoting *Okali*, 648 F.3d at 220) (stating that the fourth element of a § 1981 hostile work environment claim is that the defendant's conduct is imputable to his or her employer).

In sum, Salley satisfies, the first, second, and fourth elements of a § 1981 hostile work environment claim as to Smith.  However, she does not satisfy the third element, and thus her hostile work environment claim against Smith cannot survive Defendants' Motion to Dismiss. Accordingly, the Court will dismiss, without prejudice, Count II as to Smith.

**4.      Salley Does Not Plausibly Allege that the School Board Had an Official Policy or Custom of Discrimination, So Her Hostile Work Environment Claim as to the School Board Must Fail**

The Court will also grant the Motion to Dismiss Count II as to the School Board.  The Fourth Circuit has held that "the § 1983 requirement that plaintiffs show an official policy or custom of discrimination also controls in § 1981 actions against state entities." *Dennis v. Cnty. of Fairfax*, 55 F.3d 151, 156 (4th Cir. 1995).  A plaintiff may demonstrate the existence of an

---

[24] Because Salley fails to plead facts in her Amended Complaint enabling the Court to find that Smith's conduct was objectively severe or pervasive enough to satisfy the third element of a hostile work environment claim, the Court need not, and will not, address the subjective prong—whether Salley subjectively believed that Smith's conduct was severe or pervasive sufficient to satisfy the third element.

official policy in four ways: "(1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that 'manifest[s] deliberate indifference to the rights of citizens;' or (4) through a practice that is so 'persistent and widespread' as to constitute a 'custom or usage with the force of law.'" *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 217 (4th Cir. 1999)).

In this § 1981 action, Salley fails to assert facts reasonably supporting the existence of an official policy or custom attributable to the School Board. To be sure, Salley alleges that the School Board had a "policy to condone discriminatory employment practices, apologize for them, but do nothing to correct or ameliorate the work environment." (Am. Compl. ¶ 15.) But beyond this "sole, conclusory allegation regarding the existence of [the School Board's] racially discriminatory custom or policy, the Amended Complaint is devoid of facts evidencing the existence of such." *Spellman v. Sch. Bd. of City of Chesapeake, Va.*, No. 2:17cv635, 2018 WL 5799648, at *10 (E.D. Va. Oct. 15, 2018), *report and recommendation adopted*, No. 2:17cv635, 2018 WL 5799585 (E.D. Va. Nov. 5, 2018). And while Salley pleads episodic instances of School Board members ignoring her complaints of racial discrimination and harassment, (*see* Am. Compl. ¶¶ 15, 17), an official policy or custom cannot "be inferred merely from municipal inaction in the face of isolated constitutional deprivations by municipal employees." *Milligan v. City of Newport News*, 743 F.2d 227, 230 (4th Cir. 1984). Moreover, that Salley served as Acting Superintendent after the School Board fired McKinley and before Smith arrived, (*see* Am. Compl. ¶ 19), and that she previously served as the Interim Finance Director, (*see id.* ¶ 9), further bolsters the notion that the School Board did not have an official policy or custom of discrimination.

40

Accordingly, the Court will grant the Motion to Dismiss as to the School Board in Count II, thus dismissing Salley's hostile work environment claim in its entirety.

### C.  Salley Fails to State a Claim in Count III Because She Does Not Plausibly Allege Adverse Employment Action or Causation

The Court will dismiss Salley's retaliation claim in Count III because her allegations do not show that Defendants took an adverse employment action against her, or that Defendants took any such action because of her complaints about Superintendent McKinley and Interim Superintendent Smith.

#### 1.  Legal Standard:  Retaliation Claim Under § 1981

Section 1981 prohibits retaliation in reaction to protected workplace activity.  42 U.S.C. § 1981.  "To establish a prima facie case of retaliation under [§ 1981], [a plaintiff] must" satisfy three elements. *Guessous*, 828 F.3d at 217.  The plaintiff must show:  "(i) that [he or she] engaged in protected activity, (ii) that [the employer] took adverse action against [him or her], and (iii) that a causal relationship existed between the protected activity and the adverse employment activity." *Id.* (internal quotation marks and citations omitted); *see Boyer-Liberto*, 786 F.3d at 281 (explaining that a prima facie retaliation claim under § 1981 comprises the same elements as a Title VII retaliation claim); *see also Comcast Corp.*, 140 S. Ct. at 1014 (stating that § 1981 plaintiffs must show that their race was a but-for cause of their injury).  The Fourth Circuit has instructed that protected activity "includes complaints of discrimination based upon race" and "[c]omplaints raised through internal company procedures." *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 122 (4th Cir. 2021) (internal quotation marks and citations omitted).

Courts within the Fourth Circuit take an expansive view of what constitutes protected activity, examining "the course of a plaintiff's conduct through a panoramic lens" and "judging the picture as a whole." *DeMasters v. Carilion Clinic*, 796 F.3d 409, 418 (4th Cir. 2015).

41

However, "[i]n order to sustain a § 1981 claim for retaliation based upon race, the protected activity must also involve race." *Ali v. BC Architects Eng'rs, PLC*, No. 1:18cv01385, 2021 WL 2816016, at *6 (E.D. Va. May 28, 2021) (citing *Liegeois v. Johns Hopkins Med.*, No. 15-2919, 2016 WL 1625121, at *6 (D. Md. 2016), *aff'd*, 692 F. App'x 714 (4th Cir. 2017)).  That is, § 1981 covers claims for retaliation, but only "for complaining about racial discrimination." *Liegeois*, 2016 WL 1625121, at *6.

### 2. Although Salley Satisfies the First Element of a Retaliation Claim Under § 1981, She Does Not Satisfy the Second or Third Elements, and Thus Her Retaliation Claim Must Fail

Salley plausibly alleges that she engaged in a protected activity, the first element of a § 1981 retaliation claim.  Although Salley does not contend that her complaints to the School Board stated that McKinley and Smith's conduct was racially motivated, at this procedural juncture, the Court will presume her complaints alleged racially motivated conduct.  (*See* Am. Compl. ¶¶ 9, 13, 24, 47.)  Therefore, viewing Salley's Amended Complaint in a light most favorable to her, Salley engaged in a protected activity when she complained to the School Board about McKinley and Smith's harassment and discrimination which she claimed to be racially motivated.  (*See id.*)

However, Salley fails to plausibly allege that Defendants took an adverse employment action against her.  "An adverse employment action is a discriminatory act that adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment." *Roberts*, 998 F.3d at 122 (alteration in original) (quoting *Change Lim v. Azar*, 310 F. Supp. 3d 588, 601 (D. Md. 2018)).[25]  Salley alleges that "the School Board took an adverse employment action against [her],

---

[25] While the analysis of an adverse action "depends on the particular circumstances of the case," an adverse action must be material. *Adams v. Anne Arundel Cnty. Pub. Sch.*, 789 F.3d 422, 431 (4th Cir. 2015).  All adverse action tests "require that there be an adverse employment

by effectively forcing her out of the school system," which "resulted in an adverse effect on the terms, conditions, and benefits of her employment." (Am. Compl. ¶ 49.) But this allegation does not withstand scrutiny. It is beyond dispute that the School Board never terminated Salley, and the Court has already concluded that Salley does not state a claim for constructive discharge. Consistent with its findings as to constructive discharge, the Court therefore finds implausible any contention that Defendants effectively forced Salley to leave ACPS. Because Salley fails to plausibly allege that Defendants took an adverse employment action against her, her retaliation claim founders.[26]

Even if Salley did plausibly allege adverse employment action, her retaliation claim falters because she fails to aver the requisite but-for causal connection and thus does not satisfy the third element. Indeed, the timing belies any contention that the protected activities here (Salley's complaints about McKinley and Smith) caused the alleged adverse employment action (her resignation): Her complaints occurred at least three months (and in some cases several

---

action, which denotes some direct or indirect impact on an individual's employment as opposed to harms immaterially related to it." *Id.* (citations and quotations omitted).

[26] In briefing, Salley posits an alternative theory for adverse employment action: that "McKinley and Smith both defamed [her] and reprimanded her publicly and in writing." (Resp. 11.) The Court cannot consider legal theories outside the Amended Complaint when resolving a motion to dismiss. *See Travelers Indem. Co. v. Lessard Design, Inc.*, 321 F. Supp. 3d 631, 639 (E.D. Va. 2018) (citing *Campbell ex rel. Equity Units Holders v. Am. Int'l Grp., Inc.*, 86 F. Supp. 3d 464, 472 n.9 (E.D. Va. 2015), for the proposition that "parties cannot amend their complaints through their oppositions"); *see also Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016) ("A motion to dismiss tests the sufficiency of a complaint . . . and our evaluation is thus generally limited to a review of the allegations of the complaint itself." (internal quotation marks and citation omitted)). Even if the Court were to consider the new legal theory posited in Salley's briefing, it would not alter the outcome of this matter. This Court has made clear that "reprimands, without collateral consequences, are not materially adverse" employment actions. *Byrd-Hedgepeth v. Cap. One Servs., LLC*, No. 3:19cv5, 2020 WL 5831822, at \*26 (E.D. Va. Sept. 30, 2020). Because Salley does not allege that she suffered collateral consequences from Defendants' reprimands, these allegations do not plausibly show that Defendants took an adverse employment action against Salley.

years) before she left ACPS. *See Smith v. Va. Hous. Dev. Auth.*, 437 F. Supp. 3d 486, 514–15 (E.D. Va. 2020) ("[T]he Fourth Circuit has ruled that when at least three to four months separated the [materially adverse employment action] . . . and the claimed protected activities the time period was too long to establish a causal connection on the basis of temporal proximity alone." (alterations in original) (citations and quotation marks omitted)). Salley does not allege any facts enabling this Court to establish causation by means other than temporal proximity. Thus, the three-month gap between Salley's final complaints and her resignation indicates that her retaliation claim cannot survive Defendants' Motion to Dismiss.

Even presuming Salley plausibly alleges that she engaged in a protected activity, because she fails to state facts reasonably showing adverse employment action and a causal connection between any such action and her complaints about McKinley and Smith, her retaliation claim fails. The Court therefore will grant the Motion to Dismiss as to Count III.

**D.      Salley Fails to State a Claim in Count IV Because She Does Not Allege Defendants Intentionally Interfered with Her Contract**

The Court next considers Salley's tortious interference with contract claim in Count IV. In this count, Salley avers that she had a valid contract with ACPS, with which Superintendent McKinley and Interim Superintendent Smith interfered through their discrimination, harassment, and retaliation. (Am. Compl. ¶¶ 56–57.) Because Salley does not plausibly plead that Defendants intentionally interfered with her contract, however, the Court will dismiss Count IV without prejudice.

**1.      Legal Standard: Tortious Interference with Contract Claim Under Virginia Law**

To establish tortious interference with a contract, a plaintiff must prove four elements:

(1) [T]he existence of a valid contractual relationship . . . ; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and[,]

(4) resultant damage to the party whose relationship or expectancy has been disrupted.

*Dunlap v. Cottman Transmission Sys., LLC*, 754 S.E.2d 313, 318 (Va. 2014) (quoting *Chaves v. Johnson*, 335 S.E.2d 97, 102 (Va. 1985)). In addition, for contracts terminable "at will," such as Salley's contract,[27] the plaintiff must satisfy a fifth element: He or she must show that "the acts or methods used for the interference [were] themselves . . . 'improper.'" *Maximus, Inc. v. Lockheed Info. Mgmt. Sys. Co.*, 493 S.E. 2d 375, 378 (Va. 1997) (citation omitted); *see also Connect IT Sols., Inc. v. Fidelis Cybersecurity, Inc.*, No. 1:17cv1306, 2019 WL 8112895, at *5 (E.D. Va. Jan. 28, 2019) (citing *Maximus, Inc.*, 493 S.E.2d at 378, for the same proposition).

## 2. Because Salley Does Not Allege Intentional Interference with Her Contract, Salley Fails to State a Tortious Interference with Contract Claim

Salley fails to state a tortious interference with contract claim because she has not adequately alleged intentional interference, the third element of a tortious interference with contract claim.[28] First, as a matter of law, "[a] person cannot intentionally interfere with his [or her] own contract." *Fox v. Deese*, 362 S.E.2d 699, 708 (Va. 1987) (citing *Chaves*, 335 S.E.2d at 102); *see also L-3 Commc'ns Corp. v. Serco, Inc.*, 926 F.3d 85, 91 (4th Cir. 2019) (citing *Fox*,

---

[27] No party disputes that Salley's contract, assuming a valid one existed, was terminable at will. (*See* Mem. Supp. 24 n.6; Resp. 13.)

[28] With regard to the first element, Salley makes only the conclusory assertion that she "had a valid contract with ACHS and reasonable business expectancies in her employment and property rights." (Am. Compl. ¶ 55.) Salley's Amended Complaint does not otherwise supply the Court with well-pleaded facts to infer "the essential elements of a valid, binding contract under Virginia law: offer, acceptance, valuable consideration, identification of the subject matter, and expression of the contract obligations with reasonable certainty." *Beatley v. Ayers*, No. 3:18cv37, 2018 WL 4365578, at *4 (E.D. Va. June 26, 2018) (citation omitted). While Salley's legal conclusion is not entitled to the presumption of truth that otherwise governs this motion to dismiss, Defendants do not contest that Salley "had a valid contract with ACHS." (Am. Compl. ¶ 55.) Because Defendants do not contest the existence of a valid contract, the Court will presume that Salley had a valid contract for the purposes of her tortious interference with contract claim. Even so, her claim still fails.

362 S.E.2d 699 for the same proposition). Moreover, "[i]n a situation where an employee was 'acting within the scope of his employment, then he was an agent of the [employer]' such that . . . he [or she] could not interfere with'" the employer's contract. *Harrington v. Sprint Nextel Corp.*, No. 1:08cv336, 2008 WL 2228524, at *7 (E.D. Va. May 29, 2008) (second alteration in original) (citing *Fox*, 362 S.E.2d at 708).

      Salley's Amended Complaint contains no allegations to support the conclusion that Superintendent McKinley and Interim Superintendent Smith acted outside the scope of their employment during the events she describes. (*Cf.* Am. Compl.) *See Harrington*, 2008 WL 2228524, at *7 (citing *Fox*, 362 S.E.2d at 708, and *Calkins v. Pacel Corp.*, 3:07cv25, 2007 WL 2301626, at *2 (W.D. Va. 2007)) ("In most circumstances, the question of 'whether the defendants were acting within the scope of their employment is an issue that requires an evidentiary hearing,'" but "the Court can dismiss the claim without a hearing if the party fails to allege action outside the scope of the ordinary duties of an employee in that position."). Although Salley asserts that McKinley and Smith interfered with her contract by "discriminating against [her] and publishing false and defamatory statements about [her]," (Am. Compl. ¶ 57), she falls short of ever alleging that those actions exceeded the bounds of McKinley and Smith's employment relationship with ACPS. Indeed, the actions Salley pleads that McKinley and Smith took were in the context of their roles as her supervisors. (*See* Am. Compl. ¶¶ 9, 11–17, 21–25, 27.) Because Salley proffers no facts supporting the conclusion that McKinley or Smith acted outside the scope of their employment, her claim for tortious interference with her contract falters.[29] The Court therefore will grant the Motion to Dismiss as to Count IV.

---

      [29] Even if she did declare that Superintendent McKinley and Interim Superintendent Smith's actions exceeded the bounds of McKinley and Smith's employment relationship with ACPS, the facts Salley states regarding those actions, taken as true, do not establish that McKinley and Smith acted outside the scope of their employment. "Virginia courts generally

**E.    Salley Fails to State a Claim in Count V Because the Intracorporate Immunity Doctrine and the Statute of Limitations Bar Her Common Law Conspiracy Claim**

Finally, the Court will dismiss Count V.  In this count, Salley alleges that McKinley and Smith conspired "with others for the express purposes of injuring [Salley] and tortiously interfering with her employment as Principal [of] ACHS."  (Am. Compl. ¶ 60.)  Because the intracorporate immunity doctrine and the statute of limitations bar her claim of common law conspiracy, the Court will grant Defendants' Motion to Dismiss on Count V.

**1.    Legal Standard:  Common Law Conspiracy**

In Virginia, a plaintiff asserting common law conspiracy must allege that "two or more persons combined to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means." *T.G. Slater & Son, Inc. v. Donald P. & Patricia A. Brennan LLC*, 385 F.3d 836, 845 (4th Cir. 2004).  A conspiracy claim must relate to an underlying tort. *Com. Bus. Sys., Inc. v. Halifax Corp.*, 484 S.E.2d 892, 896 (Va. 1997).  Because of this relationship between a conspiracy claim and an underlying tort, "the limitations period for civil conspiracy is based on the statute of limitations for the underlying act." *Bd. of Dirs. of Lesner Pointe Condo. on Chesapeake Bay Ass'n, Inc. v. Harbour Point Bldg. Corp.*, No. CL00-1893, 2002 WL 32072394, at \*9 (Va. Cir. Ct. June 18, 2002); *accord Lokhova v. Halper*, 441 F. Supp. 3d 238, 266 (E.D. Va. 2020), *aff'd*, 995 F.3d 134 (4th Cir. 2021).  In Virginia,

---

take a broad view of the employment relationship[] and have held that even intentional torts may be within the scope of employment." *Martinez v. Drug Enf't Admin.*, 111 F.3d 1148, 1156 (4th. Cir 1997); *see, e.g., Emami v. Bolden*, 175 F. Supp. 3d 616, 621 (E.D. Va. 2016) (holding that a supervisor's defamation alleged by his subordinate fell "squarely within that supervisor's scope of employment under Virginia law").  Because Salley does not aver that McKinley and Smith acted outside the scope of their employment, and because an employee cannot interfere with his or her employer's contract by acting within the scope of employment, Salley's allegations of intentional interference fail as a matter of law. *See Fox*, 362 S.E.2d at 707; *Calkins*, 2007 WL 2301626, at \*2.

"[t]he statute of limitations for a defamation action is one year," accruing on the date the defamatory acts occurred. *Dragulescu v. Va. Union Univ.*, 223 F. Supp. 3d 499, 508 (E.D. Va. 2016) (citations omitted); *see also* Va. Code § 8.01-247.1 (providing one-year limitations period for defamation claims).

Under the intracorporate immunity doctrine, as in a tortious interference with contract claim, "[i]f a principal/agent or an employer/employee relationship exists between the parties, the parties are not separate entities" for purposes of a common law conspiracy claim. *Rogers v. Deane*, 992 F. Supp. 2d 621, 633 (E.D. Va. 2014) (citing *Perk v. Vector Res. Grp., Ltd.*, 485 S.E.2d 140, 144 (Va. 1997)). The intracorporate immunity doctrine holds that "acts of corporate agents are acts of the corporation itself, and corporate employees cannot conspire with each other or with the corporation." *ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 179 (4th Cir. 2002). The doctrine stems from the principle that a single entity cannot legally conspire with itself. *Rogers*, 992 F. Supp. 2d at 633. However, employees nevertheless may constitute separate entities capable of conspiring if they acted outside the scope of their employment. *See id.* (citing *Fox*, 362 S.E.2d at 699).

### 2. The Intracorporate Immunity Doctrine and the Statute of Limitations Bar Salley's Common Law Conspiracy Claim

As the Court explained during the discussion of Salley's tortious interference with contract claim, her allegations, viewed in the light most favorable to her, do not support the inference that Superintendent McKinley and Interim Superintendent Smith acted outside the scope of their employment during any of the conduct which Salley claims entitles her to relief. Under the intracorporate immunity doctrine, McKinley and Smith "cannot conspire with each other or with" ACPS, their employer. *Aboud*, 313 F.3d at 179. Because, under the law, McKinley and Smith are not separate entities capable of conspiring with each other, Salley's

48

allegations cannot establish that "two or more persons combined" or conspired against her, an essential element of a common law conspiracy claim. *T.G. Slater*, 385 F.3d at 845.

Salley's conspiracy claim also fails because it is barred by the statute of limitations for defamation. Salley predicates this claim on the torts of "[t]ortious interference with contract and defamation." (Resp. 17.) Because, as discussed, Salley fails to state a tortious interference with contract claim, *see supra* Part III.D.2, the only remaining basis for her conspiracy claim is defamation. The one-year statute of limitations, however, has expired on any defamation claim Salley has against Defendants.

A claim for defamation accrues when the defamatory conduct occurred. *Dragulescu*, 223 F. Supp. 3d at 508. In Salley's Amended Complaint, the last potential instance of defamation attributable to McKinley occurred in November 2017, when he allegedly issued a false statement about Salley to the local news. (Am. Compl. ¶ 9.) Assuming this conduct amounted to defamation, the limitations period on Salley's claim against Superintendent McKinley expired in November 2018, two years before Salley initiated this action on November 8, 2020 in Virginia state court. *See Dragulescu*, 223 F. Supp. 3d at 508.

Any defamation claim against Interim Superintendent Smith, as stated in Salley's Amended Complaint, has likewise expired. The last potential instance of defamation attributable to Smith involved the February 21, 2019 email Smith wrote to Salley with Director Reasoner copied in which Smith falsely accused her of lying. (Am. Compl. ¶ 9.) The one-year limitations period on any defamation claim related to this email ran in February 2020, more than eight months before Salley commenced this lawsuit. *See Dragulescu*, 223 F. Supp. 3d at 508. The statute of limitations therefore bars Salley's defamation claims against McKinley and Smith.

Accordingly, Salley fails to allege a tort underlying her common law conspiracy claim, an essential element of this claim under Virginia law. *Com. Bus. Sys.*, 484 S.E.2d at 896.

Because the intracorporate immunity doctrine and the statute of limitations preclude Salley's common law conspiracy claim, the Court will grant the Motion to Dismiss as to Count V.

### IV.  Conclusion

For the foregoing reasons, the Court will grant the Motion to Dismiss.  The Court will dismiss all counts against the School Board, McKinley, and Smith, without prejudice.

An appropriate Order shall issue.

/s/
M. Hannah Lauck
United States District Judge

M. Hannah Lauck
United States District Judge

Date: 12/3/2021
Richmond, Virginia